UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

LAURA JEAN HAMMERSLEY,

          Plaintiff,

v.                                        Case No. 5:08-cv-245-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

          Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 9) and both parties have filed briefs outlining their respective positions. (Docs. 15 & 16.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED.**

## I. PROCEDURAL HISTORY

On December 30, 2004, Plaintiff filed an application for a period of disability and disability insurance benefits, claiming a disability onset date of April 11, 2003. (R. 98-101.)[1] Plaintiff's application was denied initially and upon reconsideration. (R. 31-44, 65-66, 68-69.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge

---

[1] The record also shows that Plaintiff previously filed an application for disability insurance benefits on July 24, 2000 alleging disability since June 1, 2000. (R. 22, 48-58.) On June 27, 2002, ALJ Philemina Jones found Plaintiff not disabled. The Appeals Council vacated the decision and remanded the case for further proceedings. On April 10, 2003, ALJ Jones issued another unfavorable decision. The Appeals Council denied review and apparently no appeal was filed.

("ALJ"). (R. 64.) On August 24, 2007, the ALJ conducted Plaintiff's administrative hearing. (380-93.) On September 27, 2007, the ALJ issued a decision unfavorable to Plaintiff. (R. 22-30.) Plaintiff timely filed a request for review with the Appeals Council (R. 18), which denied her request for review (R. 7-10.) On June 20, 2008, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are

---

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

4

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was forty-six years old at the time of the hearing. (R. 383.) Plaintiff has a bachelor's degree (R. 383) and has worked as a speech pathologist in the public school system. (R.106, 389.) Plaintiff contends that she has been unable to work since April 11, 2004, due to anxiety, panic attacks, and pain in her right ankle, right knee and the bottom of her feet. (R. 123, 125 389.)

From as early as 2003 through March 27, 2007, Plaintiff has been treated for a variety of physical problems at Community Medical Care Center, a free clinic sponsored by a church in Leesburg, Florida. (R. 225-90, 317-31, 386.) Plaintiff consistently reported pain in her knees and feet and she was diagnosed with hypothyroidism,

---

[19] Walker at 1003.

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

hypertension, plantar fascitis, hypertension, obesity, asthma and anemia. An October 13, 2005, x-ray of the right knee demonstrated mild medial compartment arthritis. (R. 279.) On November 30, 2005, Plaintiff reported that pain in her right knee had gotten worse and that it had "distinct giving away" and pain to her right patellar tendon. (R. 225.) The assessment was patellar tendinitis and peroneal tendinitis. On February 1, 2006, Plaintiff's right leg below the knee was larger than the left, the top of her feet looked edematous but her gait was spontaneous and she was not limping. (R. 326.)

Plaintiff was treated by Jeffrey Krotenberg, D.O., a psychiatrist. The record includes treatment notes from a total of eight appointments during 2003, 2004 and 2005. (R. 193-206.) These notes consistently show that Plaintiff was oriented and had a euthymic mood. She also had normal sleep, appetite and energy levels; normal motivation and interest; no hopelessness; and no problems with memory, concentration, attention, or social withdrawal. Dr. Krotenberg's notes do not suggest that Plaintiff experienced suicidal ideation, panic attacks, anxiety or mania. Dr. Krotenberg prescribed Xanax. Dr. Krotenberg consistently reported Plaintiff's GAF score as 75.

On March 1, 2005, Dr. Krotenberg completed a Psychiatric/Psychological Impairment Questionnaire in which he stated that he had been treating Plaintiff every three to four months over the course of ten years. (R. 195-202.) Dr. Krotenberg diagnosed Plaintiff with panic disorder with agoraphobia and found that she had appetite disturbance with weight change, mood disturbance, recurrent panic attacks and difficulty thinking or concentrating. He noted that Plaintiff's primary symptoms were inattentiveness, decreased concentration/memory, recurrent panic attacks and decreased energy. He also noted that Plaintiff's recurrent panic attacks interfere with

6

gainful employment.  Dr. Krotenberg noted that Plaintiff's highest GAF score in the past year was 55.  He found that Plaintiff had moderate limitations in 13 functional areas and marked limitation in the ability to maintain attention and concentration for extended periods.  Dr. Krotenberg opined that due to her depressive episodes and recurrent panic attacks, Plaintiff experiences episodes of deterioration or decompensation in work or work like settings which cause him/her to withdraw from that situation and/or experience exacerbation of signs and symptoms.  Dr. Krotenberg opined that Plaintiff only was capable of low work stress.

On March 14, 2006, Plaintiff began psychiatric treatment and underwent a psychiatric evaluation at Lifestream Behavioral Center with Eugene Silverstein, M.D.. (R. 315-16.)  Plaintiff reported doing "fairly well but still has periods of depression exacerbated by anger." (R. 315.)  On mental status examination, Plaintiff was somewhat disheveled but alert and oriented; calm and rational; her affect was appropriate; her mood was stable although she has periods of depression that Plaintiff attributed more to the pain she is experiencing; she was not suicidal or homicidal; she had no loose associations or paranoid ideation; her psychomotor activity was within normal limits; she had no signs of mania; her intelligence is above average; and she has good insight, judgment and impulse control although she complains of some irritability.  Dr. Silverstein's diagnosis was major depression without psychotic features; chronic pain, history of bulimia, hypothyroidism, hypertension; psychosocial stressors; and a GAF of 55.  Dr. Silverstein prescribed desipramine and also Xanax but suggested that Plaintiff switch to Celexa if she could afford it.

7

On August 20, 2007, Dr. Silverstein completed a Psychiatric/Psychological Impairment Questionnaire. (R. 353-60.) Dr. Silverstein diagnosed Plaintiff with panic attacks and major depression and noted that her prognosis was fair due to incomplete resolution of symptoms. Dr. Silverstein found that her diagnosis was supported by numerous clinical findings including personality change, mood disturbance, emotional lability, recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, past suicidal ideation or attempts, social withdrawal or isolation, decreased energy and hostility and irritability. He found that Plaintiff had marked limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

In Function Reports, Plaintiff represented that she attends church, talks on the phone, and goes to friends' homes. (R. 133, 137, 141, 388). She grocery shops with her husband, uses public transportation, and drives a car short distances. (R. 132, 140, 388.) She prepares meals, watches television, performs limited household chores and cares for her pets. (R. 130, 137-39.) She reads daily and occasionally knits, draws, and swims. (R. 133, 137, 141.) The ALJ found notable that, despite allegations that Plaintiff had difficulty concentrating, she reads daily as a hobby. (R. 26, 133, 137, 141.)

8

There are two physical residual function capacity ("RFC") assessments of record which were performed by non-examining state agency physicians. Edward Holifield, M.D. performed an assessment on July 21, 2005. (R. 185-92.) Based on his review of the medical records, Holifield concluded that Plaintiff could frequently lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, walk/stand or sit for about six hours of an 8-hour workday, and push and/or pull without limitation. Holifield further found that Plaintiff should avoid concentrated exposure to fumes and odors.

A second RFC assessment was performed on February 2, 2006 finding that Plaintiff could frequently lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, walk/stand for at least 2 hours in an 8-hour workday, sit for about six hours of an 8-hour workday, and push and/or pull with limitation in her lower right extremity; limiting her to occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and directing her to avoid concentrated exposure to extreme temperatures and fumes and odors and to avoid even moderate exposure to hazards. (R. 291-98.)[23]

There are two psychiatric review technique forms which were completed by non-examining state agency physicians. T. Wayne Conger, Ph.D. performed his review on September 8, 2005. (R. 207-24.) Conger found that Plaintiff's panic disorder with agoraphobia, in partial remission resulted in only mild or moderate limitations. The second assessment consists of five pages of a thirteen page by report by "Dr. James Mendelson" dated February 12, 2006. (R. 299-303.) Mendelson found that Plaintiff's

---

[23] Although not entirely legible, it appears as though "Jim Takackmo" performed this second assessment.

"Panic Disorder in Meds Remission" resulted in only mild limitations. Mendelson opined that while Plaintiff may have a mental impairment, it was not "of disabling proportions."

At the video hearing on August 24, 2007, Plaintiff testified that anxiety and panic attacks are a huge problem but that her symptoms are helped by Xanax. (R. 384.) Plaintiff testified that her panic attacks have increased in frequency and are occurring three to five times per week. They last about twenty minutes, and sometimes longer. (R. 385.) She reported difficulty sleeping, weekly crying spells. (R. 391.) Plaintiff reported pain in her knees and ankles, worse on the right side. (R. 386.) She uses a cane sometimes and is prescribed medicine for the pain. Plaintiff is 5'4 and weighs about 230 pounds. (R. 386.) Plaintiff testified that she helps with the cooking sometimes, she feeds the pets, performs limited chores around the house, and is able to drive a car short distances. (R. 388-89.) She further testified that she could lift ten or fifteen pounds, stand for ten or fifteen minutes without hurting, walk for five or ten minutes and sit for twenty or thirty minutes. (R. 389-90.)

In his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff suffered from degenerative joint disease, osteoarthritis, obesity and asthma (R. 24.) The ALJ specifically found that Plaintiff did not have a severe mental impairment. (R. 27.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (Id.)

The ALJ then found that Plaintiff retained the RFC to lift 20 pounds occasionally and ten pounds frequently and sit, stand or walk for about six hours in an eight-hour

workday; her ability to push and pull with the right foot is frequently limited; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and she should avoid concentrated exposure to extreme cold and heat and fumes, odor, dust, gases and poor ventilation, and moderate exposure to moving machinery and hazards. (R. 28.) In reaching this conclusion, the ALJ found that Plaintiff's subjective allegations of pain and functional limitations of disabling severity were not fully credible (R.28-30.) The ALJ then found that Plaintiff could perform her past relevant work as a speech and language therapist. Thus, the ALJ found that Plaintiff was not disabled.

## IV. **DISCUSSION**

Although her arguments are divided into several headings, Plaintiff's arguments all relate to the ALJ's conclusion at the second step of the sequential disability determination that Plaintiff does not have a severe mental impairment. At the second step, the ALJ must "consider the medical severity of [the claimant's] impairments."[24] In doing so, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills."[25] This is a threshold inquiry and only claims based on the most trivial impairments are rejected.[26] "An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to

---

[24] See Wind v. Barnhart, 133 Fed.Appx. 684, 690 (11th Cir. 2005)(*quoting* Phillips v. Barnhart, 357 F.3d. 1232, 1237 (11th Cir. 2004).

[25] See id.

[26] See McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

11

work, irrespective of age, education or work experience."[27] A diagnosis is insufficient; instead, Plaintiff must show the effect of the impairment on her ability to work.[28]

Plaintiff argues that the ALJ improperly rejected the opinions of treating psychiatrists – Dr. Krotenberg and Dr. Silverstein – and, instead relied exclusively upon the opinion of James Mendelson, a state agency consultant. Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court finds that the ALJ properly considered the opinions of Dr. Krotenberg and Dr. Silverstein as treating physicians and properly relied in part upon the opinion of James Mendelson.

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[29] If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[30]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly

---

[27] Id.

[28] See Wind, 133 Fed.Appx. at 690 (*quoting* McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[29] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[30] 20 C.F.R. § 404.1527(d)(2).

conclusory.[31] Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[32]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[33] However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[34]

Here, both Dr. Krotenberg and Dr. Silverstein completed Psychiatric/ Psychological Impairment Questionnaires in which they found that Plaintiff had moderate and marked limitations resulting from her mental impairments. As an initial matter, courts have found that check-off forms, such as the questionnaires completed by Dr. Krotenberg and Dr. Silverstein, have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the

---

[31] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[32] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[33] 20 C.F.R. § 404.1527(d).

[34] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

conclusions.[35] Moreover, as discussed below, the ALJ properly rejected these opinions because they were inconsistent with the doctors' own treatment notes and the Plaintiff's activities of daily living.

Although Dr. Krotenberg noted that he had treated Plaintiff for ten years, the record only includes treatment notes from eight appointments during 2003, 2004 and 2005. These notes consistently showed that Plaintiff was alert, oriented, and had a euthymic mood. She also had normal sleep, appetite and energy levels; normal motivation and interest; no hopelessness; and no problems with memory, concentration, attention, or social withdrawal. Dr. Krotenberg's notes do not suggest that Plaintiff experienced suicidal ideation, panic attacks, anxiety or mania. Moreover, while Dr. Krotenberg noted on the questionnaire that Plaintiff's most recent GAF was 55, none of his treatment notes in the record reflect a GAF score below 75. Accordingly, Dr. Krotenberg's findings regarding functional limitations are not supported by his treatment notes.

Likewise, Dr. Silverstein's treatment notes do not support his opinions regarding Plaintiff's functional limitations. As an initial matter, Dr. Silverstein did not begin treating Plaintiff until March 2006 – three months after her date last insured had expired in December 2005. (R. 81, 310.) In order to demonstrate Plaintiff is entitled to disability insurance benefits, she must establish that she became disabled prior to the expiration

---

[35] See Spencer o/b/o Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)(rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); see also Mason v. Shalala, 994 F.2d 1058, 1065 (3rd Cir. 1993)(noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")

of her insured status.[36] Thus, Dr. Silverstein's treatment notes and opinion are only marginally relevant to Plaintiff's claim.

However, even assuming Dr. Silverstein's treatment notes are relevant to Plaintiff's condition prior to December 2005, they do not support her claim of a severe mental impairment. At her initial psychiatric evaluation on March 14, 2006, Plaintiff reported that she was doing "fairly well but still having periods of depression exacerbated by anger." (R. 315.) However, on mental status examination, Dr. Silverstein found that Plaintiff was alert and oriented; she was calm and rational; her affect was appropriate; she was not suicidal or homicidal; her mood was euthymic; she had no loose associations, paranoid ideation, or mania; her psychomotor activity was within normal limits; she had above average intelligence; and she had good insight, judgment and impulse control. (R. 315-16.) In subsequent treatment notes, Dr. Silverstein consistently noted normal findings – i.e., Plaintiff's appearance was appropriate, her behavior was cooperative, her cognition was reality based, she had no hallucinosis, her orientation was times 3, her judgment was normal and she had no suicidal/homicidal ideation. (R. 304-09.) Indeed, other than noting that Plaintiff's mood was anxious on two occasions (R. 305-06) and that she reported insomnia on one occasion (R. 304.), Dr. Silverstein never made any findings consistent with the significant functional limitations he reported on the questionnaire.

---

[36] See 42 U.S.C. §§423(a), (c); see also Casey v. Secretary of Health and Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993)(evidence dated after date last insured is "outside the scope of our inquiry.")

15

Both of the state agency consultants who evaluated the records – Dr. Conger in September 2005 and Dr. Mendelson in February 2006 – agreed that Plaintiff suffered from a panic disorder that was in partial or full remission. (R. 212, 300.) Dr. Conger found that Plaintiff's condition causes primarily mild limitations and while she had some anxiety symptoms at times, she "remains functional from a mental perspective." (R. 217, 219.) Dr. Mendelson opined that while Plaintiff may have a mental impairment, it was not "of disabling proportions" and resulted in only mild functional limitations. (R. 301, 303.)

Plaintiff argues that the ALJ improperly relied "exclusively" on the opinion of a Dr. Mendelson to support his finding that Plaintiff does not have a severe mental impairment. While the ALJ assigned "considerable weight" to the opinion of Dr. Mendelson, he did not rely solely upon the opinion of Dr. Mendelson. Indeed, as discussed above, the treatment notes from Dr. Krotenberg and Dr. Silverstein support the ALJ's finding that Plaintiff's mental impairments are not severe and only result in mild limitations.

Plaintiff's other arguments as to why the ALJ should not have relied upon Dr. Mendelson's opinions are equally without merit. Plaintiff argues that she cannot determine whether Dr. Mendelson is an acceptable medical source because the Psychiatric Review Technique merely states "Dr. James Mendelson" and does not indicate whether Plaintiff holds a doctorate, is licensed or has an area of specialization. The Court is unaware of any requirement that state agency examiners must provide a curriculum vitae. Moreover, the regulations define "acceptable medical sources" to

16

include a broad range of practitioners, such as licensed physicians and psychologists.[37] There is no evidence that Dr. Mendelson, who is identified as "Dr." and referred to by the ALJ as a psychologist (R. 27), does not fall into one of those broad categories. Moreover, as discussed above, the ALJ's conclusion that Plaintiff did not have a severe mental impairment was supported not just by Dr. Mendelson's opinion, but by the ALJ's own review of the evidence, including Dr. Krotenberg and Dr. Silverstein's treatment notes.

Plaintiff also argues that Dr. Mendelson's Psychiatric Review Technique form is incomplete because it is missing pages two through five and seven through ten. (R. 299-303.) However, review of a complete form, such as the one used by Dr. Conger (R. 207-19) shows that Dr. Mendelson omitted pages that pertain to mental disorders that are not at issue in this case – i.e., organic mental disorders; schizophrenic, paranoid and other psychotic disorders; affective disorders; mental retardation; somatoform disorders; personality disorders; substance addiction disorders and autistic disorders. Moreover, Dr. Mendelson expressly disputed Dr. Krotenberg's conclusions and opined that Plaintiff's symptoms are in "full meds remission." Thus, Plaintiff's argument that the missing pages might show that Dr. Mendelson actually agreed that Plaintiff had a severe mental impairment is without merit.

In addition to the medical records, Plaintiff's activities of daily living support the ALJ's conclusion that Plaintiff's mental impairments are not severe. Activities of daily living are relevant to a claimant's symptoms and are properly considered by the ALJ in

---

[37] See 20 C.F.R. §404.1513.

17

making a disability determination.[38] Despite her complaints of depression and anxiety, Plaintiff is able to attend church, talk on the phone, and go to friends' homes. (R. 133, 137, 141, 388). She grocery shops with her husband, uses public transportation, and drives a car short distances. (R. 132, 140, 388.) She prepares meals, watches television, performs limited household chores and cares for her pets. (R. 130, 137-39.) She occasionally knits, draws, and swims. (R. 141.) The ALJ found notable that, despite allegations that Plaintiff had difficulty concentrating, she reads daily as a hobby. (R. 26, 133, 137, 141 388.) Accordingly, the ALJ properly found that Plaintiff's activities of daily living are inconsistent with her claim that she has severe mental impairments.

For theses reasons, the ALJ's finding at the second step of the sequential disability determination that Plaintiff does not have a severe mental impairment is supported by substantial record evidence.

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g). The Clerk is directed to enter final judgment in favor of the Defendant consistent with this Order and to close the file.

**IN CHAMBERS** in Ocala, Florida, on September 18, 2009.

Copies to:
    Counsel of Record

GARY R. JONES
United States Magistrate Judge

---

[38] See 20 C.F.R. §404.1529(c)(3)(i); Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987.)